```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
HINDS COUNTY, MISSISSIPPI,          :
                                    :
                   Plaintiff,       :
                                    :
      - against -                   :    08 Civ. 2516
                                    :
WACHOVIA BANK N.A. et al.,          :
                                    :
                   Defendants.      :
----------------------------------X
IN RE MUNICIPAL DERIVATIVES         :
ANTITRUST LITIGATION                :    08 MDL No. 1950
                                    :
THIS DOCUMENT RELATES TO:           :    DECISION AND ORDER
ALL ACTIONS                         :
----------------------------------X
```

**VICTOR MARRERO, United States District Judge.**

This action is the lead case in the consolidated pretrial proceedings of the multidistrict litigation <u>In re Municipal Derivatives Antitrust Litigation</u>, 08 MDL No. 1950. Plaintiffs are municipalities and other purchasers of municipal derivatives. The claims in this action arise out of an alleged unlawful conspiracy on the part of more than forty corporate defendants and others to illegally rig bids, limit competition, and fix prices in the municipal derivatives market, in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 ("§ 1"). All of the defendants except three now move to dismiss the consolidated amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)"). For the reasons set forth below, the motion is GRANTED.

## I. BACKGROUND

A.   <u>PARTIES</u>

Plaintiffs Fairfax County, Virginia, the State of Mississippi, the City of Baltimore, Maryland, the Central Bucks School District, and the Bucks County Water and Sewer Authority (collectively, "Named Plaintiffs") filed the operative consolidated amended class (the "CAC") action complaint on August 22, 2009.  The Named Plaintiffs purport to represent a class (the "Class") consisting of:

> All state, local and municipal government entities, independent government agencies and private entities that purchased by competitive bidding or auction Municipal Derivatives directly from a Provider Defendant, at any time from January 1, 1992 through the present in the United States and its territories or for delivery in the United States and its territories.

(CAC ¶ 129.)

The defendants as named in the CAC are: Bank of America, N.A. ("BoA"); Wachovia Bank N.A. ("Wachovia"); AIG Financial Products Corp. ("AIG"); Bear, Stearns & Co., Inc. ("Bear Stearns"); Financial Security Assurance Holdings, Ltd. ("Financial Security Holdings"); Financial Security Assurance, Inc. ("Financial Security Assurance"); Financial Guaranty Insurance Co. LLC ("Financial Guaranty"); GE Funding Capital Market Services, Inc. ("GE"); Genworth Financial Investment Management, LLC ("Genworth"); Feld Winters Financial LLC ("Feld Winters"); Natixis S.A. ("Natixis"); JP Morgan Chase &

Co. ("JP Morgan"); Piper Jaffray & Co. ("Piper Jaffray");
Société Générale SA ("Société Générale"); AIG SunAmerica Life
Assurance Co. ("AIG SunAmerica"); UBS AG ("UBS"); XL Capital,
Ltd. ("XL Capital"); XL Asset Funding Co. I, LLC ("XL
Funding"); XL Life Insurance & Annuity Inc. ("XL Life");
Merrill Lynch & Co., Inc. ("Merrill Lynch"); Morgan Stanley;
National Westminster Bank PLC ("NatWest"); Natixis Funding
Corp ("Natixis Funding"); Investment Management Advisory
Group, Inc. ("Investment Management Advisory"); CDR Financial
Products ("CDR"); Winters & Co. Advisors, LLC ("Winters &
Co."); First Southwest Company ("First Southwest"); George K.
Baum & Co. ("Baum"); Kinsell Newcomb & De Dios Inc. ("Kinsell
Newcomb"); PackerKiss Securities, Inc. ("PackerKiss");
Shockley Financial Corp. ("Shockley"); Sound Capital
Management, Inc. ("Sound Capital"); Cain Brothers & Co., LLC
("Cain Brothers"); Morgan Keegan & Co., Inc. ("Morgan
Keegan"); Trinity Funding Co. LLC ("Trinity Funding"); and
Municipal Government Investors Corp. ("MGIC") (collectively,
the "Defendants").[1]

---

[1]     Subsequent to the filing of the CAC, unspecified plaintiffs
(represented by co-lead counsel firms Susman Godfrey LLP, Hausfeld LLP,
and Boies, Schiller & Flexner LLP, as well as plaintiffs' counsel Green
Welling, LLP and Meredith Cohen Greenfogel & Skirnick, P.C.) voluntarily
dismissed without prejudice their complaint as against Feld Winters,
PackerKiss, Shockley Financial, Financial Guaranty, Cain Brothers, and
NatWest. In one of the consolidated cases, City of Oakland v. AIG Fin.
Prods. Corp., No. 08-CV-6340, plaintiff City of Oakland voluntarily
dismissed Genworth Financial, Inc. and joined Genworth. In the
consolidated cases City of Oakland v. AIG Fin. Prods. Corp. No. 08-CV-
6340; County of Alameda v. AIG Fin. Prods. Corp., No. 08-CV-7034; and City

B.   <u>FACTUAL ALLEGATIONS</u>[2]

1.   Municipal Derivatives

This action involves allegations of a conspiracy "to fix, maintain or stabilize the price of, and to rig bids and allocate customers and markets for, Municipal Derivatives." (Id. ¶ 1.)   The CAC defines municipal derivatives as the investment vehicles used by issuers of or those who receive money from the issuance of municipal bonds, which are bonds issued by states, cities, counties, or their agencies, as well as by tax-exempt, non-profit private entities.[3]   The term

---

of Fresno v. AIG Fin. Prods. Corp., No. 08-CV-7355, plaintiffs City of Oakland, County of Alameda, and City of Fresno voluntarily dismissed their complaint against Genworth Financial, Inc.  In each of the above cases, as well as in <u>Fresno County Fin. Authority v. AIG Fin. Prods. Corp.</u>, No. 09-CV-1199, plaintiffs City of Oakland, County of Alameda, City of Fresno, and Fresno County Financing Authority voluntarily dismissed their complaint against NatWest, Shockley, and Cain Brothers.

Lehman Brothers, Inc. ("Lehman Brothers") was named as a defendant in <u>Hinds County, Mississippi v. Wachovia Bank N.A.</u>, No. 08-CV-2516, as well as <u>Fairfield County, Virginia v. PackerKiss Securities, Inc.</u>, No. 08-CV-5492; <u>Mayor and City Counsel of Baltimore v. Wachovia Bank, N.A.</u>, No. 08-CV-6142; <u>Central Buck School District v. Wachovia Bank, N.A.</u>, No. 08-CV-6342; and <u>Washington County, Tennessee v. Bank of America, N.A.</u>, No. 08-CV-6304.  By Order dated December 16, 2008, the Court stayed the consolidated action against Lehman Brothers pursuant to the Order Commencing Liquidation, dated September 18, 2009, and the automatic stay provisions of the Bankruptcy Code.

[2]     The facts below are taken from the CAC, which the Court accepts as true for the purpose of ruling on a motion to dismiss.  <u>See</u> <u>Spool v. World Child Int'l Adoption Agency</u>, 520 F.3d 178, 180 (2d Cir. 2008) (<u>citing</u> <u>GICC Capital Corp. v. Technology Fin. Group, Inc.</u>, 67 F.3d 463, 465 (2d Cir. 1995)).

[3]     The Court notes that in their memorandum in support of their motion to dismiss, the Defendants who have moved to dismiss the CAC contest the accuracy of the CAC's description of municipal derivatives.  The Court, however, accepts the description of municipal derivatives as set forth in the CAC as true for the purposes of considering this motion to dismiss.  <u>See</u> <u>Spool</u>, 520 F.3d at 180.

"municipal derivatives" refers to "a variety of tax-exempt vehicles that government entities use to invest the proceeds of bond offerings while they are waiting to spend them for their given purposes." (Id. ¶ 61.) The CAC divides municipal derivatives into two categories, "pertaining either to (a) the investment of bond proceeds, or (b) the bond's underlying interest rate obligations." (Id. ¶ 64.) Specific types of municipal derivatives relating to the investment of bond proceeds include escrow agreements and guaranteed investment contracts ("GICs"). (Id.) Municipal derivatives relating to a bond's underlying interest rate obligations include instruments such as swaps, options, "swaptions" (a combination of a swap and an option), interest rate floors, and collars. (Id.)

### 2.   The Alleged Conspiracy

The CAC alleges that from January 1, 1992 through August 22, 2008 (the date of the CAC), the Defendants who issued and sold municipal derivatives to members of the Class (the "Provider Defendants"), along with the Defendants who acted as brokers for members of the Class in purchasing municipal derivatives from the Provider Defendants (the "Broker Defendants"), engaged in a conspiracy to "fix prices, and to rig bids and allocate customers and markets of Municipal Derivatives sold in the United States." (Id. ¶ 6.) The

-5-

purpose of the conspiracy was to "artificially suppress interest rates paid on, lower the value of, and reduce and stabilize the market prices of Municipal Derivatives sold by the Provider Defendants." (Id. ¶ 106.) The CAC alleges that Defendants' conduct caused the Named Plaintiffs to receive lower interest rates on their municipal derivatives contracts than they would have received in a competitive market, and that they "paid ancillary fees and other costs and expenses related thereto." (Id. ¶ 6.)

    a.   Conduct Alleged

The Provider Defendants allegedly conspired to "allocate customers and fix or stabilize the prices of Municipal Derivatives, including the interest rates paid to issuers on such derivatives." (Id. ¶ 83.) The Provider Defendants purportedly "understood that they would take turns providing the winning bid." (Id. ¶ 84.) The Provider Defendants allegedly either communicated directly with each other or communicated indirectly through one or more Broker Defendants, who would suggest bids for the Provider Defendants to make. The CAC alleges that the Provider Defendants who won bids would compensate those Provider Defendants who had refrained from submitting bids or who had submitted sham bids.

According to the CAC, "[t]he interconnected nature of the Municipal Derivatives industry facilitated and reinforced the

conspiratorial conduct alleged herein." (Id. ¶ 89.) Marketing personnel in the municipal derivative or bond departments of the Provider Defendants allegedly engaged in "per se illegal horizontal communications" regarding: "the rigging of bids"; "conduct that would be used to limit competition"; "sharing of profits from a winning bid with a losing bidder and other secret compensation of losing bidders"; "bids that would be won by specific Provider Defendants"; and "an exchange of a deliberately losing bid for a future winning bid." (Id. ¶ 90.) The CAC contends that these employees engaged in conduct to facilitate: courtesy bids; unrealistically low and deliberately losing bids; "bidding processes where only one bid was sufficiently high to make the deal work"; "agreements to share profits from a winning bid with a losing bidder through transactions between Provider Defendants"; violations of Internal Revenue Service ("IRS") regulations during bidding processes; secret agreements to allow a Provider Defendant to view competing bids before submitting its own bid ("last look agreements"); and "agreements not to bid." (Id. ¶ 92.) The CAC names twelve individuals who allegedly engaged in the communications and conduct described above: three former BoA employees, four former JP Morgan employees, and five individuals employed by or formerly employed by Bear Stearns, Wachovia, or UBS.

The Broker Defendants allegedly participated in the conspiracy "by arranging the allocation of winning bids among the Provider Defendants," and the Broker Defendants allegedly communicated with the Provider Defendants regarding: "winning bids that would be allocated to Provider Defendants"; confirmation of which bids would be won and lost by particular Provider Defendants; "the fact that bids were being rigged"; and "bid levels that would be necessary by Provider Defendants to win or lose a bid." (Id. ¶ 93.)  The CAC names three individuals employed or formerly employed by Broker Defendants Piper Jaffray, Baum, and PackerKiss, who allegedly engaged in these communications.

　　b.　Opportunities to Collude

Named Plaintiffs contend that "[t]he conspiracy has been facilitated through intercompetitor trade associations," including the International Swaps & Derivatives Association, the American Bankers Association, and the Securities Industry and Financial Markets Association.  (Id. ¶ 96.)  Some Defendants are members of one or more of these associations. The CAC alleges that conferences presented by the Information Management Network, such as the New England Public Finance Conference and the Issuers & Investors Summit, also provided "venues to collude."  (Id. ¶ 97.)

c.   <u>Allegations of Kickbacks</u>

The CAC cites various instances of kickbacks paid during the course of the alleged conspiracy.  As an example, the CAC alleges that CDR had a secret agreement with the provider of a GIC for bonds issued in 1999 by an entity in Gulf Breeze, Florida, which allowed CDR to increase its fees if none of the $200 million in bond proceeds was used for its intended purpose, which was to provide affordable housing.  Another example provided by the CAC is the $453 million GIC that BoA provided to the City of Atlanta in 2002, in which CDR was the broker and handled the bidding.  The CAC also cites a lawsuit filed in 2007 by Biola University against BoA, alleging that BoA shared kickbacks with BNP Paribas relating to bond issuances and related swaps.

Named Plaintiffs also point to a June 28, 2002 e-mail from Douglas Campbell, a former BoA sales team manager, to Phil Murphy, the former head managing director of BoA's derivatives department, as evidence of kickbacks that were paid by BoA "on a transaction where the external business contact was not involved in the transaction."  (<u>Id.</u> ¶ 100.) The CAC reproduces this e-mail, and alleges that the e-mail reflects $182,393 in payments to CDR, Piper Jaffray, PaineWebber, and Winters, and that these payments were meant

to "build [BoA]'s relationship with these companies or to say 'thanks for all the swap business.'" (Id.)

The CAC also cites over twenty lease-to-own deals between CDR and Société Générale that are being examined by the IRS as examples of bid-rigging and kickbacks.  The CAC notes that the IRS expressed concern about quarterly payments made by Société Générale to CDR relating to a $27 million bond sold by "Pima County, Arizona's Industry Development Authority."  (Id. ¶ 102.)  The CAC refers to "CDR's involvement in California school advance refunding escrows and put option cases from several issuers around the nation."  (Id. ¶ 101.)

The CAC alleges that Baum "illegally diverted profits on municipal bond deals," as disclosed in a settlement with the IRS covering deals entered into between 1997 and 2001.  (Id. ¶ 103.)  The IRS purportedly found evidence of bid-rigging by Baum, as well as evidence that Baum allowed an entity called CDC Funding Corp. ("CDC"), which the CAC alleges was the predecessor to Natixis, to "underpay for the GIC and simultaneously overpay for other investment agreement and remarketing fees."  (Id.)  CDC purportedly "paid a large fee directly to David Lail of Defendant Baum."  (Id.)  In addition, Baum allegedly received a "significant hidden payment" from BoA in connection with "a $100 million issue from the Illinois Development Finance Authority sold in 2000

-10-

by Rural Enterprises of Oklahoma, Inc. ('Rural Enterprises')," and Baum also accepted an IRS penalty in November 2006, "purportedly in connection with bid-rigging involving Natixis." (<u>Id.</u> ¶ 104.)

As a further example of kickbacks relating to the alleged conspiracy, Named Plaintiffs contend that "Feld Winters engaged in an unlawful kickback scheme with Pacific Matrix Financial Group, Inc. and O'Brien Partners, Inc. with respect to Municipal Derivatives transactions in the 1990s." (<u>Id.</u> ¶ 101.)

The CAC alleges that BoA, JP Morgan, Bear Stearns, and Lehman Brothers, Inc. ("Lehman Brothers") were paid "six times above the prevailing rate" in fees for interest rate swaps for Jefferson County, Alabama between 2001 and 2004, and that CDR was the adviser to Jefferson County. (<u>Id.</u> ¶ 105.) The Securities and Exchange Commission ("SEC") brought an action against Jefferson County's former county commission president, alleging that he had accepted an improper payment from an underwriter in connection with the swaps, and the Department of Justice ("DOJ") is also "investigating the bankers and officials involved in these swaps." (<u>Id.</u>) The CAC further asserts that "at least four JP Morgan bankers" at the time, including the former head of municipal derivatives sales for

JP Morgan, have been advised that "they could face criminal charges." (<u>Id.</u>)

    d.   <u>Related Investigations and History of Fraud</u>

The CAC cites the IRS's investigation into the "collusive practices in the Municipal Derivatives industry" in support of its allegations of an industry-wide conspiracy. (<u>Id.</u> ¶ 108.) The IRS investigation purportedly revealed that investment contracts were sold at below-market rates, artificially lowering investment yields and thus the required payments to the IRS. The "spread" between the investment and the bond yields was then allegedly passed on to the bonds' providers. (<u>Id.</u> ¶ 108.) This investigation allegedly "led an investment banking firm to uncover transcripts of telephone conversations involving an employee that indicated the employee and other market participants were involved in bid-rigging on GICs in the municipal market." (<u>Id.</u> ¶ 112.) In February 2007, BoA announced a payment to the IRS of $14.7 million in connection with BoA's "role in providing GICs ... to some state and local government entities." (<u>Id.</u> ¶ 113.)

Named Plaintiffs also point to the DOJ Antitrust Division's investigation into the municipal derivatives industry. This investigation has involved raids by the Federal Bureau of Investigation, as well as subpoenas that were served on various Provider and Broker Defendants. The

CAC names eleven individuals who "have been targeted for possible indictment by the DOJ or notified that they are part of the DOJ's investigation." (Id. ¶ 120.)

In addition, the CAC cites BoA's participation in the DOJ's antitrust corporate leniency program in connection with the DOJ's investigation into the municipal derivatives industry's bidding practices. The DOJ's conditional grant of amnesty provides that the DOJ will not bring a criminal antitrust prosecution against BoA in connection with matters that BoA has reported to the DOJ, in return for BoA's continuing cooperation with the DOJ.

The CAC also alleges that numerous Provider Defendants have received subpoeans from attorneys general of various states, in connection with investigations of the municipal derivatives industry.

Finally, the CAC points to the history of fraud in the municipal derivatives market, citing the 1998 sanctioning of twenty-one firms for "fraudulent activities that raised the price on Treasury bonds sold to local governments, driving down the yield, to avoid restrictions on how much they could earn." (Id. ¶ 127.) The CAC notes that one of the Provider Defendants, Piper Jaffray, was involved in this earlier scandal. The CAC also cites a $220,000 civil settlement in connection with the alleged bid-rigging of a GIC transaction

involving the Oklahoma Turnpike Authority in 1989, and a forward contract in 1992.

C.   <u>PROCEDURAL BACKGROUND</u>

In January 2007, BoA entered into the antitrust corporate leniency program administered by the DOJ under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA"). <u>See</u> Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, tit. II, §§ 201-221, 118 Stat. 661, 665-669.   Multiple civil antitrust actions against various defendants were subsequently filed by various municipalities and other entities across the country. Pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation ("MDL") transferred all pending and subsequent related actions to this District on June 16, 2008, and ordered that they be assigned to this Court for coordinated or consolidated pretrial proceedings.   In accordance with the MDL Order, seventeen cases were ultimately transferred and consolidated with the designated lead case.

The CAC was filed on August 22, 2008.   In it, Named Plaintiffs allege that Defendants conspired "to fix, maintain or stabilize the price of, and to rig bids and allocate customers and markets for, Municipal Derivatives" in violation of § 1.   (CAC ¶ 141.)   The allegations in the CAC are based in part on "publicly available information, including regulatory

-14-

filings," as well as information gained from "confidential discussions" with BoA over a fourteen-month period, in the context of "a settlement process." (Id. ¶ 2.) The CAC seeks treble damages pursuant to the Clayton Act, 15 U.S.C. § 15. (Id. ¶ c.)

The CAC alleges that the conspiracy has had the following effects: price competition in the sale of municipal derivatives was "restrained, suppressed, and/or eliminated"; bids were "fixed, stabilized and maintained at non-competitive levels"; customers and markets for municipal derivatives were "allocated among Defendants and their co-conspirators"; Class members received lower interest rates than they otherwise would have; and Class members "have been injured and financially damaged." (Id. ¶ 142.)

The CAC also alleges that Defendants fraudulently concealed their unlawful conduct such that Named Plaintiffs and Class members could not have discovered the violations alleged until shortly before the CAC was filed. (Id. ¶ 146.) Defendants concealed their conduct by: "meeting secretly to discuss prices, customers, and markets"; agreeing "not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme"; "intentionally creating the false appearance of competition by engaging in sham auctions";

engaging in "covert sharing of profits or other secret compensation paid to losing bidders"; "secretly communicating about bids that would be won or lost by the Provider Defendants"; "paying kickbacks to Broker Defendants"; "submitting cover or courtesy bids, or unrealistically low or other artificial bids, and/or deliberately losing bids, to create the appearance of competition"; and entering into "covert agreements not to bid." (Id. ¶ 147.)

All Defendants except for BoA, Feld Winters, and MGIC (the "Joint Defendants") filed a motion to dismiss the CAC, accompanied by a memorandum of law in support. A group of Defendants who characterized themselves as Defendants against whom the CAC's only allegation was that they reportedly received government subpoenas in the course of an investigation into the municipal derivatives market (the "Subpoena Defendants") also filed a motion to dismiss, as well as a supplemental memorandum of law in support of the Joint Defendants' motion to dismiss. Société Générale filed a supplemental memorandum of law regarding the allegations against it. Natixis Funding also filed a supplemental memorandum of law. The Named Plaintiffs filed memoranda of law in opposition to the Joint Defendants' motion to dismiss, as well as memoranda in opposition to the memoranda from the Subpoena Defendants, Société Générale, and Natixis Funding.

## II. DISCUSSION

A.   LEGAL STANDARD

In assessing a motion to dismiss under Rule 12(b)(6), dismissal of a complaint is appropriate if the plaintiff has failed to offer sufficient factual allegations making the asserted claim plausible on its face. See Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007). A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The task of the court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." In re Initial Pub. Offering Secs. Litig., 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (internal quotation marks and citation omitted). The court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). Section One of the Sherman Antitrust Act prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of [interstate] trade or commerce." 15 U.S.C. § 1. The Supreme Court's decision in Twombly addressed the pleading standards for a § claim to survive a

motion to dismiss.  See Twombly, 550 U.S. 544.  The Second
Circuit has determined that Twombly does not require a
universal standard of heightened pleading, but rather "a
flexible 'plausibility standard,' which obliges a pleader to
amplify a claim with some factual allegations in those
contexts where such amplification is needed to render the
claim plausible."  Iqbal, 490 F.3d at 157-58 (emphasis in
original).  It is clear from Twombly that when a § 1 claim is
based solely on allegations of parallel conduct, to survive a
motion to dismiss those allegations "must be placed in a
context that raises a suggestion of a preceding agreement, not
merely parallel conduct that could just as well be independent
action."  Twombly, 550 U.S. at 557.

Regardless of whether parallel conduct is alleged, "[t]o
survive a motion to dismiss under Twombly, it is not enough to
make allegations of an antitrust conspiracy that are
consistent with an unlawful agreement; to be viable, a
complaint must contain 'enough factual matter (taken as true)
to suggest that an agreement [to engage in anticompetitive
conduct] was made.'"  In re Elevator Antitrust Litig., 502
F.3d 47, 50 (2d Cir. 2007) (alteration in original) (quoting
Twombly, 550 U.S. at 556).  The complaint must contain enough
factual matter "to raise a reasonable expectation that

discovery will reveal evidence of illegal agreement."
Twombly, 550 U.S. at 556.

B.   PLAUSIBILITY ANALYSIS

The CAC makes broad allegations of a conspiracy among the
Defendants, stretching from January 1992 to August 2008.  The
Defendants are named in the suit because at least one Class
member allegedly purchased a municipal derivative from or
through each Defendant, yet the CAC contains specific factual
averments regarding only a few of the Defendants.  The Court
will first address the claims against the Defendants which
have moved to dismiss the CAC – the Joint Defendants – about
whom the CAC makes no specific factual allegations, before
addressing the claims against the remaining Joint Defendants
who are alleged to have some particular factual connection to
the alleged conspiracy.

1.   Joint Defendants: No Specific Allegations

For the majority of the Joint Defendants, the CAC alleges
only that a particular Provider Defendant "issued and sold
Municipal Derivatives to members of the Class," (CAC ¶¶ 15-
37), or that a particular Broker Defendant "acted as a broker
for members of the Class in purchasing Municipal Derivatives
from the Provider Defendants." (Id. ¶¶ 38-52.)  The CAC makes
no specific allegations regarding the following Joint
Defendants' involvement in the alleged conspiracy: AIG;

Financial Security Holdings; Financial Security Assurance; Financial Guaranty; GE; Genworth; AIG SunAmerica; UBS; XL Capital; XL Funding; XL Life; Merrill Lynch; Morgan Stanley; NatWest; Investment Management Advisory; First Southwest; Kinsell Newcomb; Shockley; Cain Brothers; Morgan Keegan; and Trinity Funding.  The Court finds that the CAC therefore fails to state a claim against these Joint Defendants.

The allegations that Class members bought municipal derivatives from or through these Joint Defendants are insufficient to state a § 1 claim because those allegations merely aver that these Joint Defendants were involved in the sale of municipal derivatives, not that they were involved in a conspiracy to rig bids, fix prices, or allocate customers and markets for municipal derivatives.  The CAC does not specify which Named Plaintiffs or Class members bought municipal derivatives from or through any particular Joint Defendants.  The CAC alleges that all Joint Defendants agreed to rig bids, fix prices, and allocate customers and markets with respect to municipal derivatives.  Joint Defendants purportedly engaged in "per se illegal horizontal communications" in order to arrange the details of the conspiracy, such as which Provider Defendants would win a particular bid and at what price, and any kickbacks or other compensatory payments to be made.  (Id. ¶ 90.)  These

allegations contain no factual averments as to the majority of the Joint Defendants, and with respect to these Joint Defendants the Court cannot find that the CAC has stated a § 1 claim based on such conclusory and perfunctory allegations.   To state a claim against each Defendant, Named Plaintiffs must "make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy." In re Static Random Access Memory (SRAM) Antitrust Litig., 580 F. Supp. 2d 896, 904 (N.D. Calif. 2008) (finding plaintiffs' allegations to be sufficient under Twombly).   "[A]verments of agreements made at some unidentified place and time" are "insufficient to establish a plausible inference of agreement, and therefore to state a claim." Elevator Litig., 502 F.3d at 50.   A complaint that enumerates "basically every type of conspiratorial activity that one could imagine" and that lists "in entirely general terms without any specification of any particular activities by any particular defendant" is "nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever." Id. at 50-51 (quoting In re Elevator Antitrust Litig., No. 04 CV 1178, 2006 WL 1470994, at **2-3 (S.D.N.Y. May 30, 2006)).   When a complaint "relies either on wholly conclusory statements of concerted action, or, at best, on mere parallel conduct," and when plaintiffs "sprinkle[] the words 'conspired,'

-21-

'concerted,' and concertedly' throughout" the complaint, that complaint is insufficient to state a § 1 claim.  Arista Records LLC v. Lime Group LLC, 532 F. Supp. 2d 556, 577 (S.D.N.Y. 2007) (complaint alleging that record companies conspired to impose a mandatory licensing regime for distribution using hash-based filtering technology failed to state a § 1 claim when it did not "allege any facts identifying which record companies were actually approached by [the plaintiff], which companies refused to provide hashes or required [the plaintiff] to seek a license, ... when such refusals took place or how they were effectuated, or whether any of the companies were aware of each other's actions").

Although Named Plaintiffs allege that all Defendants participated in the alleged conspiracy and engaged in conduct and communications in furtherance of the conspiracy, Named Plaintiffs have "failed to plead facts plausibly suggesting a 'meeting of the minds'" among any of these Joint Defendants. Id. at 579.

Beyond bare allegations that a conspiracy existed, the CAC relies on some of the Joint Defendants' involvement with trade associations or conferences.  However, participation in trade associations or conferences cannot support the CAC's allegations of a conspiracy.  Named Plaintiffs "have not pleaded that defendants ever met and agreed to [engage in the

alleged antitrust violations]; they plead at most that defendants had the opportunity to do so because they attended many of the same meetings." In re Graphics Processing Units Antitrust Litig., 527 F. Supp. 2d 1011, 1024 (N.D. Calif. 2007). An allegation that Joint Defendants had the opportunity to interact and make an agreement does not "nudge[] [Named Plaintiffs'] claims across the line from conceivable to plausible" with respect to their claims against these Joint Defendants. Twombly, 550 U.S. at 570.

Named Plaintiffs also rely on the existence of various government investigations into the municipal derivatives industry to support their claims. The CAC refers to investigations by the DOJ Antitrust Division, the IRS, the Securities and Exchange Commission ("SEC"), and various state attorneys general, and points out that subpoenas have been issued to many of the Defendants in connection with these investigations. Named Plaintiffs' citations to these investigations do not constitute factual averments of a § 1 claim that would allow such a claim to survive a motion to dismiss. In Graphics Processing, the court noted that although the plaintiffs had alleged that the DOJ's Antitrust Division had "served defendants with subpoenas and is conducting a grand jury investigation," that investigation "carries no weight in pleading an antitrust conspiracy claim."

-23-

527 F. Supp. 2d at 1024.  The court noted that the scope of
the investigation was "pure speculation" and that it was
"unknown whether the investigation will result in indictments
or nothing at all."  Id.  Similarly, the court in SRAM, when
considering a DOJ "grand jury investigation ... and related
subpoenas served on various Defendants," determined that "the
existence of the investigation does not support Plaintiff's
antitrust conspiracy claims," even though the Court ultimately
found that plaintiffs had sufficiently pled a § 1 claim.  580
F. Supp. 2d at 903.

     This Court agrees that the various investigations,
inquiries, and subpoeans do not make the CAC's allegations
plausible, for the purposes of deciding a motion to dismiss
under the standards as laid out in Twombly and Iqbal.  With
respect to the DOJ, SEC, and state attorneys general
investigations referenced in the CAC, there is no information
in the CAC about the progress of most of these investigations
and there is no indication from any of these proceedings that
wrongdoing of the kind alleged has occurred.

     The closest the CAC comes to making specific factual
averments relating to a government investigation that might
make its allegations more plausible is its description of an
IRS investigation into "collusive practices in the Municipal
Derivatives industry."  (CAC ¶ 108.)  The CAC quotes IRS

officials' comments on the existence of bid-rigging in the municipal derivatives industry generally and alleges that the IRS investigation "led an investment banking firm to uncover transcripts of telephone conversations" implicating an employee "and other market participants" in bid-rigging "on GICs in the municipal market." (Id. ¶ 112.) The CAC then notes that BoA paid $14.7 million to the IRS "for its role in providing GICs ... to some state and local government entities." (Id. ¶ 113.) The CAC also alleges that "the IRS has stated that it has come across instances of price-fixing, bid-rigging and kickbacks." (Id. ¶ 114.) These allegations, though suggestive, are too general to make an antitrust claim plausible as to any specific Defendant other than BoA. Taking these factual averments as true, the Court still cannot conclude that they give "reasonably founded hope that the [discovery] process will reveal relevant evidence to support a § 1 claim" against the Joint Defendants about whom the CAC makes no specific allegations. Twombly, 550 U.S. at 559 (internal quotation marks and citation omitted) (alteration in original).

Named Plaintiffs also argue that the participation of one of the Joint Defendants, BoA, in the DOJ's antitrust corporate leniency program supports the CAC's allegations of an industry-wide conspiracy. The CAC quotes a BoA press release,

-25-

which refers to the DOJ's "investigation into bidding
practices in the municipal derivatives industry." (Id. ¶
123.)  The CAC also provides an excerpt of a 10-K form filed
by BoA with the SEC, which refers to investigations by the
DOJ, SEC, and IRS, and states, "[t]he activities at issue in
these industry-wide government investigations concern the
bidding process for municipal derivatives that are offered to
states, municipalities and other issuers of tax-exempt bonds."
(Id. ¶ 125.)  The CAC offers no other information about BoA's
participation in the DOJ's leniency program or the results of
any of the government investigations.  Named Plaintiffs argue
that BoA was required to admit its participation in a criminal
antitrust violation as a condition of being accepted into the
leniency program, and that this admission means that BOA's
participation in the leniency program does make Named
Plaintiffs' allegations as to all of the Defendants plausible.

     With respect to the Joint Defendants named in the CAC's
allegations of specific transactions or communications
involving BoA, BoA's participation in the leniency program
could bolster the Named Plaintiffs' claims.  The Court
addresses the claims against those Joint Defendants below.
With respect to the Joint Defendants about whom the CAC makes
no specific allegations, BoA's participation in the leniency
program cannot be taken as a factual averment making a finding

of a conspiracy more plausible, for the purposes of a motion to dismiss.  BoA's participation in the leniency program simply supports a general allegation of a conspiracy in the industry, but this is not sufficient to state a claim against the Joint Defendants who are not the subject of specific allegations in the CAC.

Finally, the Court cannot accept the CAC's reference to a history of fraud in the municipal derivatives market as a factual averment that supports the CAC's present claims, at least as to some of the Joint Defendants whose alleged unlawful conduct is not otherwise plausibly verified. Sanctions imposed in 1998 and a civil settlement regarding transactions in 1989 and 1992 that did not involve any of these Defendants cannot be said to establish a history of fraud in the market, and even if they could, these allegations do not make the claims against any of such Defendants more plausible.

Named Plaintiffs argue that any lack of specificity regarding the role played by any particular Defendant goes to the question of whether there was a single, industry-wide conspiracy or whether there were multiple smaller conspiracies among the Defendants.  Named Plaintiffs contend that this is a question that should not be resolved at the motion to dismiss stage.  The Court finds that the issue of single or

-27-

multiple conspiracies is irrelevant because, as discussed above, the claim that the Joint Defendants who are not implicated in the CAC's specific allegations of wrongdoing were involved in an industry-wide conspiracy, or even in multiple, smaller conspiracies, is based entirely on the happenstance that those Joint Defendants were involved in the sale of municipal derivatives. The Court has explained why the mere fact that defendants are involved in an industry that is purportedly rife with antitrust violations is not, without more, enough to state a § 1 claim. The CAC fails to allege that these Joint Defendants were involved in a single conspiracy or in multiple smaller conspiracies.

The Court finds that the Named Plaintiffs have failed to make well-pled allegations that, taken as true, raise a "reasonable expectation that discovery will reveal evidence of illegal agreement" with respect to the Joint Defendants against whom the CAC makes no specific factual averment of involvement in the alleged conspiracy. Twombly, 550 U.S. at 556. The Joint Defendants' motion is therefore granted as to the follwoing Joint Defendants: AIG; Financial Security Holdings; Financial Security Assurance; Financial Guaranty; GE; Genworth; AIG SunAmerica; UBS; XL Capital; XL Funding; XL Life; Merrill Lynch; Morgan Stanley; NatWest; Investment

Management Advisory; First Southwest; Kinsell Newcomb; Shockley; Cain Brothers; Morgan Keegan; and Trinity Funding.

    2.   <u>Joint Defendants: Specific Allegations</u>

    The CAC does make specific allegations that the following Joint Defendants received, paid, or were involved in kickbacks in connection with the sale of municipal derivatives: CDR; Société Générale; JP Morgan, Bear Stearns, Baum; Natixis; Piper Jaffray; PaineWebber; Winters; Wachovia; PackerKiss; and UBS. As explained above, the CAC's general references to a conspiracy involving all of the Defendants and its reliance on industry-wide trade associations and conferences and various government investigations cannot help Named Plaintiffs satisfy the standard for stating a § 1 claim. The Court will, however, consider whether any of the specific allegations in the CAC help Named Plaintiffs state a claim that a particular Defendant committed a § 1 violation. The Court will not consider whether these allegations make the CAC's claim regarding BoA, Feld Winters, or MGIC plausible for the purposes of a motion to dismiss, because those Defendants have not moved to dismiss the CAC. However, the Court will consider whether allegations involving BoA, Feld Winters, or MGIC support claims against other Defendants.

a.   CDR and Related Defendants

The CAC alleges that CDR had a secret agreement with the provider of a GIC for bonds issued in 1999 by an authority in Gulf Breeze, Florida, which allowed CDR to increase its fees if none of the $200 million in bond proceeds was used for its intended purpose of affordable housing.  (CAC ¶ 91.)  CDR also acted as the broker and handled the bidding for a GIC for the City of Atlanta in 2002, which the CAC cites as an instance of "bid-rigging and kickbacks."  (Id. ¶ 99.)  The CAC cites over twenty lease-to-own deals between CDR and Société Générale from 1996 to 2005, involving quarterly payments for "unspecified services" as examples of bid-rigging and kickbacks. (Id. ¶ 101.)   The CAC also refers to "CDR's involvement in California school advance refunding escrows and put option cases from several issuers around the nation." (Id. ¶ 101.) Finally, the CAC alleges that CDR acted as the adviser to Jefferson County, Alabama for the purchase of interest rate swaps between 2001 and 2004, for which BoA, JP Morgan, Bear Stearns, and Lehman Brothers were paid "six times above the prevailing rate" in fees.  (Id. ¶ 105.)

Several of these claims do not support the CAC's antitrust conspiracy allegations regarding CDR.   The allegation that CDR had an agreement allowing a fee increase if the Gulf Breeze, Florida entity did not use the proceeds

from bonds issued in 1999 for their intended purpose has no
relevance to the antitrust violations alleged here, a
conspiracy "to fix, maintain, or stabilize the price of, and
to rig bids and allocate customers and markets" for municipal
derivatives.  (Id. ¶ 1.)  Nor does CDR's alleged involvement
in "California school advance refunding escrows and put option
cases" from an unspecified time period make it more plausible
to the Court that CDR engaged in an antitrust conspiracy in
the municipal derivatives market.  (Id. ¶ 101.)  Similarly,
the allegation of over twenty improper "lease-to-own" deals
between CDR and Société Générale has no apparent relation to
municipal derivatives.

However, several of the allegations regarding CDR and
other Defendants do support the Named Plaintiffs' claims.  The
allegation that the GIC provided to the City of Atlanta by BoA
and brokered by CDR in 2002 involved kickbacks and bid-rigging
is a specific allegation of wrong-doing related to the alleged
conspiracy, as is the allegation that CDR was the adviser to
Jefferson County, Alabama for the purchase of interest rate
swaps between 2001 and 2004, for which BoA, JP Morgan, Bear
Stearns, and Lehman Brothers were paid "six times above the
prevailing rate" in fees.  (Id. ¶ 105.)  These allegations,
taken as true, make the Named Plaintiffs' claims of a
conspiracy plausible as to Joint Defendants CDR, JP Morgan,

and Bear Stearns, especially in light of BoA's participation
in the DOJ leniency program and the admission of criminal
antitrust activity that it entailed.[4]

Because the sole allegations of transactions involving
CDR and Société Générale do not relate to municipal
derivatives, the motion to dismiss is granted as to Société
Générale. The claims against CDR, JP Morgan, and Bear Stearns
remain.

b.  <u>Baum and Natixis</u>

Based on Baum's November 2006 settlement with the IRS,
the CAC also alleges that Baum "illegally diverted profits on
municipal bond deals" between 1997 and 2001.  (<u>Id.</u> ¶ 103.)
Named Plaintiffs allege that the IRS found evidence that Baum
had rigged deals to allow CDC, the predecessor to Natixis and
the winner of many of the bids, "to underpay for the GIC and
simultaneously overpay for other investment agreement and
remarketing fees, diverting arbitrage profits back to ...
Baum."  (<u>Id.</u>)   The CAC alleges that CDC paid a large fee

---

[4]     Joint Defendants refer to the complaint filed in the related SEC
enforcement action and argue that the CAC gives an inaccurate description
of the events surrounding these transactions. Courts may consider any
documents that are attached to, referenced in, or integral to the
preparation of the pleadings. <u>See</u> <u>Miller v. Lazard, Ltd.</u>, 473 F. Supp. 2d
571, 578 (S.D.N.Y. 2007) (<u>citing</u> <u>Chambers</u>, 282 F.3d at 152-53). Although
it is not clear whether it is appropriate for the Court to consider the
complaint in an SEC enforcement action when the CAC does not specify that
document as the source of its information, the Court finds that a claim
based on this particular allegation of wrongdoing can still proceed
because none of the purported inaccuracies pointed out by the Joint
Defendants affect the CAC's assertion that the involved Defendants were
paid fees "six times above the prevailing rate."  (<u>Id.</u> ¶ 105.)

directly to an employee of Baum.      The CAC also alleges that
Baum received a "significant hidden payment" from BoA in
connection with "a $100 million issue from the Illinois
Development Finance Authority sold in 2000 by Rural
Enterprises." (Id. ¶ 104.)  In July 2003, Rural Enterprises
purportedly disclosed the hidden payment made by BoA to Baum.
These allegations, taken as true, make the § 1 claim against
Baum and Natixis (as the successor to CDC) plausible for the
purposes of a motion to dismiss.

    c.   Payments Described by BoA E-mail

The CAC describes a June 28, 2002 e-mail from Douglas
Campbell, a former BoA sales team manager, to Phil Murphy, the
former head managing director of BoA's derivatives department,
documenting payments made by BoA "on a transaction where the
external business contact was not involved in the
transaction." (Id. ¶ 100.)  Named Plaintiffs allege that the
e-mail reflects $182,393 in payments to CDR, Piper Jaffray,
PaineWebber, and Winters, and that these payments were meant
to "build [BoA]'s relationship with these companies or to say
'thanks for all the swap business.'" (Id.)

The e-mail constitutes factual support for a claim that
BoA, CDR, Piper Jaffray, PaineWebber, and Winters were
involved in an arrangement or series of arrangements in which
BoA would make payments to "external business contact[s]" who

were "not involved in [a particular] transaction," and the instruments involved appear to be municipal derivatives.  This e-mail supports a factual averment that these particular defendants had some kind of potentially improper kickback or profit-sharing arrangement involving municipal derivatives, which raises Named Plaintiffs' claims with respect to CDR, Piper Jaffray, PaineWebber, and Winters above the level of speculation, for the purposes of a motion to dismiss.

> d.   Individuals Engaged in Communications in Support of the Alleged Conspiracy

The CAC names several individuals alleged to have engaged in "per se illegal horizontal communications" in support of the alleged conspiracy.  (Id. ¶ 90; ¶¶ 92-93.)  The CAC names twelve individuals employed by the Provider Defendants who allegedly engaged in these communications: three former BoA employees, four former JP Morgan employees, and five individuals employed by or formerly employed by Bear Stearns, Wachovia, or UBS.  The CAC names three individuals employed by Broker Defendants Piper Jaffray, Baum, and PackerKiss who allegedly engaged in these communications.

The CAC does not provide information on the approximate time period of these alleged communications or how frequently these communications took place.  Although the CAC does provide the names and positions of the employees allegedly involved, that is not enough to state a claim for antitrust

violations, because otherwise a § 1 claim could be stated simply by obtaining the names and positions of a defendant's relevant employees, which requires relatively minimal inquiry. For this reason, allegations that particular employees participated in communications in furtherance of the alleged conspiracy cannot make the conspiracy itself more plausible, when those allegations do not contain any other specific details.  Although the Court accepts the factual allegations in the CAC as true for the purposes of assessing the motion to dismiss, the Court cannot find that general allegations of conspiratorial communications coupled with specific names and positions of individual employees are anything more than "averments of agreements made at some unidentified place and time," which are "insufficient to establish a plausible inference of agreement, and therefore to state a claim." Elevator Litig., 502 F.3d at 50.  Taking these allegations as true would require the Court to assume the existence of the conspiracy.  This is in contrast to allegations about specific transactions involving particular Defendants; those types of allegations, taken as true, do not require the Court to assume the existence of the alleged conspiracy, and they do make the conspiracy more plausible.

The Court therefore finds that the averments regarding communications engaged in by individual employees are not

sufficient to state a claim as to JP Morgan, Bear Stearns, Wachovia, UBS, Piper Jaffray, Baum, and PackerKiss, though the Court will permit Named Plaintiffs to replead claims based on these alleged communications within twenty days of this Order. The Court notes that claims against some of these Joint Defendants may survive based on other allegations, as outlined above.

C.   <u>STATUTE OF LIMITATIONS AND FRAUDULENT CONCEALMENT</u>

The Court has determined that the motion to dismiss should be granted as to § 1 claims against all Joint Defendants except for CDR, JP Morgan, Bear Stearns, Baum, Natixis, Piper Jaffray, PaineWebber, and Winters. The Court will now consider whether the claims against these Joint Defendants were timely filed, and if not, whether Named Plaintiffs have sufficiently alleged fraudulent concealment so as to toll the statute of limitations.

A four-year statute of limitations applies to private civil antitrust actions seeking treble damages. <u>See</u> 15 U.S.C. § 15b. "An antitrust action accrues and the statute of limitations begins to run when the defendant commits an act that injures the plaintiff." <u>In re Nine West Shoes Antitrust Litig.</u>, 80 F. Supp. 2d 181, 191 (S.D.N.Y. 2000). When a plaintiff alleges a continuing antitrust conspiracy, "the general limitations rule has usually been understood to mean

-36-

that each time a plaintiff is injured by an act of the
defendants a cause of action accrues to him to recover the
damages caused by that act and that, as to those damages, the
statute of limitations runs from the commission of the act."
Id. at 192 (internal quotations marks and citation omitted).
If the plaintiff alleges a price-fixing conspiracy, "each
overt act that is part of the violation and that injures the
plaintiff, e.g., each sale to the plaintiff, starts the
statutory period running again, regardless of the plaintiff's
knowledge of the alleged illegality at much earlier times."
Id. However, "the commission of a 'separate new overt act'
will not permit the plaintiff to recover for the injury caused
by old overt acts that do not fall within the limitations
period." Id. (quoting Klehr, 521 U.S. at 189); see also
Stolow v. Greg Manning Auctions Inc., 258 F. Supp. 2d 236, 251
(S.D.N.Y. 2003). In short, Named Plaintiffs can proceed with
a claim against the remaining Joint Defendants if it is based
on an overt act that occurred within the statute of
limitations, but they can only recover damages based on those
acts, and not based on previous acts.

    1.   The CAC's Surviving Claims are Based on Events
           Outside of the Limitations Period

The claims against CDR, JP Morgan, and Bear Stearns
survived the Court's plausibility analysis because of the
allegation that the GIC provided to the City of Atlanta by BoA

and brokered by CDR in 2002 involved kickbacks and bid-rigging, as well as the allegation that CDR was the adviser to Jefferson County, Alabama for the purchase of interest rate swaps between 2001 and 2004, for which BoA, JP Morgan, Bear Stearns, and Lehman Brothers were paid "six times above the prevailing rate" in fees.  (Id. ¶ 105.)  The CAC states that a swap was negotiated in "early 2004" and that that swap and another swap were executed in "June of 2004."  (Id.)  These incidents fall outside of the statute of limitations period, which extends back to August 22, 2004.

The claims against Baum and Natixis survived because of the allegation that the IRS found evidence that Baum had rigged deals between 1997 and 2001 to allow CDC, the predecessor to Natixis and the winner of many of the bids, "to underpay for the GIC and simultaneously overpay for other investment agreement and remarketing fees, diverting arbitrage profits back to ... Baum," and that CDC paid a large fee directly to an employee of Baum.  (Id. ¶ 103.)  The allegation that Baum received a "significant hidden payment" from BoA in connection with "a $100 million issue from the Illinois Development Finance Authority sold in 2000 by Rural Enterprises" also survived the plausibility analysis.  (Id. ¶ 104.)  All of these incidents fall outside of the statute of limitations period.

The claims against Piper Jaffray, PaineWebber, and Winters survived because of the allegations stemming from the June 28, 2002 e-mail documenting payments made by BoA "on a transaction where the external business contact was not involved in the transaction."   (Id. ¶ 100.)   The e-mail allegedly reflects $182,393 in payments to CDR, Piper Jaffray, PaineWebber, and Winters, which were apparently made before June 28, 2002, placing them outside the statute of limitations period.

All of the claims that have survived the Court's plausibility analysis are therefore based upon events that occurred outside of the statute of limitations period.

### 2.   Tolling for Fraudulent Concealment

"The statute of limitations for an antitrust violation is tolled if plaintiff can show fraudulent concealment."   Nine West Shoes, 80 F. Supp. 2d at 192 (citing New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1083 (2d Cir. 1988)). To show fraudulent concealment, "an antitrust plaintiff must prove (1) that the defendant concealed the existence of the antitrust violation[;] (2) that plaintiff remained in ignorance of the violation until sometime within the four-year antitrust statute of limitations; and (3) that his continuing ignorance was not the result of lack of diligence."   Id.   The fraudulent concealment factors have also been described as:

"(1) wrongful concealment by defendants (2) which prevented plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing discovery of the claim." <u>National Group for Commc'ns & Computers, Ltd. v. Lucent Techs. Inc.</u>, 420 F. Supp. 2d 253, 265, 265 n.15 (S.D.N.Y. 2006) ("There has been some variation in the way that the three elements have been articulated in this Circuit" (<u>citing</u> <u>In re Merrill Lynch Ltd. P'ships Litig.</u>, 154 F.3d 56, 60 (2d Cir. 1998))).  A claim of fraudulent concealment must be pled with particularity, in accordance with the heightened pleading standards of Fed. R. Civ. P. 9(b) ("Rule 9(b)"). <u>See</u> <u>id.</u> at 265.

    a.   <u>Concealment by Defendants</u>

Allegations of bid-rigging and price-fixing conspiracies in violation of § 1 are self-concealing such that "a plaintiff is not required to show defendants took independent affirmative steps to conceal their conduct." <u>Nine West Shoes</u>, 80 F. Supp. 2d at 193.  "[B]y alleging a price-fixing scheme, the plaintiff sufficiently has alleged the first prong of fraudulent concealment and ... there is no need to require the pleading of affirmative actions taken by the defendants to prevent the plaintiff's discovery of its claim." <u>Id.</u>  Named Plaintiffs therefore need to plead only ignorance of the

violation and due diligence, both with the particularity required by Rule 9(b).

     b. <u>Violation Not Discovered or Plaintiffs Remained Ignorant</u>

The Court finds that the Named Plaintiffs have failed to plead the second prong of fraudulent concealment with particularity. The CAC alleges, "Plaintiffs and the Class members did not discover ... that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was commenced." (CAC ¶ 146.) The CAC does not specify when any Named Plaintiffs or Class members became aware of the antitrust violations, and therefore does not state "with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); <u>see also</u> <u>In re Magnetic Audiotape Antitrust Litig.</u>, No. 99 Civ. 1580, 2002 WL 975678, at *3 (S.D.N.Y. May 9, 2002) (allegation that knowledge about the alleged antitrust violation "was obtained 'shortly before April 1999' is very vague. Such a general allegation, without more, fails to satisfy the second prong of the fraudulent concealment test.").

The Court notes that the CAC specifies that a "significant hidden payment" to Baum from BoA, stemming from a transaction in 2000, was disclosed "in July 2003." (CAC ¶ 104.) Any claim based on this transaction or hidden payment would be time-barred because over four years have elapsed

-41-

since the disclosure of the hidden payment and the filing of
the CAC.  Although Named Plaintiffs may indeed have remained
ignorant of this disclosure, their failure to plead this fact
with specificity defeats any attempt to toll the statute of
limitations for this claim.

      c.    <u>Due Diligence or Not the Result of Lack of
Diligence</u>

The Court also finds that the Named Plaintiffs have
failed to plead the third prong with particularity.  The Court
recognizes that the case law regarding the third prong is not
entirely consistent.  The third prong has been characterized
as requiring a showing that the plaintiff's ignorance of the
claim "was not the result of lack of diligence," <u>Hendrickson
Bros.</u>, 840 F.2d at 1083.  It has also been characterized as a
requirement that a plaintiff show "due diligence in pursuing
discovery of the claim,"  <u>National Group</u>, 420 F. Supp. 2d at
265; <u>see</u> <u>also</u> <u>Merrill Lynch</u>, 152 F.3d at 60.

With respect to the first formulation, some courts have
found that allegations that due diligence would not have
uncovered the antitrust violations were sufficient to plead
the third prong of fraudulent concealment with particularity.
<u>See</u>, <u>e.g.</u>, <u>Nine West Shoes</u>, 80 F. Supp. 2d at 193 ("Plaintiffs
... could not have discovered the conspiracy at an earlier
date by the exercise of due diligence because of the
affirmative, deceptive practices and techniques of secrecy

-42-

employed by Defendants"); <u>Magnetic Audiotape</u>, 2002 WL 975678, at **2-3 (use of language similar to due diligence language in <u>Nine West Shoes</u> satisfied third prong); <u>United States Secs. & Exch. Comm'n v. Power</u>, 525 F. Supp. 2d 415, 426 (S.D.N.Y. 2007) (allegation of affirmative acts to conceal the violation satisfies diligence requirement).

This standard is problematic because it allows the allegations required to satisfy the first prong of fraudulent concealment to also satisfy the third prong. In addition, it is difficult to characterize this type of pleading as pleading with particularity. The Court agrees with the conclusion of other courts that in this context, "[g]eneral assertions of ignorance and due diligence without more specific explanation ... will not satisfy the[] pleading requirements." <u>Masters v. Wilhelmina Model Agency, Inc.</u>, No. 02 Civ. 4911, 2003 WL 1990262, at *2 (S.D.N.Y. Apr. 29, 2003) (alteration in original) (<u>quoting</u> <u>Philip Morris v. Heinrich</u>, No. 95 Civ. 0328, 1996 WL 363156, at *12 (S.D.N.Y. June 28, 1996)); <u>see also</u> <u>In re Publication Paper Antitrust Litig.</u>, No. 304 MD 1631, 2005 WL 2175139, at *6 (D. Conn. Sept. 7, 2005) (<u>citing</u> <u>Masters</u> and <u>Phillip Morris</u>). Due diligence is not adequately pled if plaintiffs "did not allege in the [complaint] that they exercised due diligence" or if they "make no allegation of any specific inquiries of [defendants], [or] detail when

such inquiries were made, to whom, regarding what, and with what response." Merrill Lynch, 154 F.3d at 60.

The Court finds that Named Plaintiffs have failed to specifically plead the third prong required to establish fraudulent concealment such that the statute of limitations should be tolled.   The CAC does not allege that Named Plaintiffs performed any kind of due diligence, only that "Plaintiffs and Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and affirmatively conceal their violations."   (CAC ¶ 146.)   As stated above, the Court recognizes the inconsistencies in the case law regarding the standard for pleading the third prong of fraudulent concealment with particularity.   However, the Court cannot find that a brief reference to "reasonable diligence," coupled with general allegations of secrecy and deception directed towards the first prong of fraudulent concealment, satisfies the Named Plaintiffs' burden under Rule 9(b) to plead the third prong of fraudulent concealment with particularity. Given the uncertainty created by the conflicting case law in

this area, Named Plaintiffs will be allowed to replead their fraudulent concealment claim.

Named Plaintiffs contend that the Court should refrain from deciding whether Named Plaintiffs should have discovered the basis for the antitrust violations alleged here because that issue implicates questions of fact that cannot be decided on a motion to dismiss. However, it is appropriate for the Court to assess the sufficiency of Named Plaintiffs' pleading of fraudulent concealment at the motion to dismiss stage. The issue is not whether Named Plaintiffs exercised due diligence, as Named Plaintiffs argue, but rather whether they have pled fraudulent concealment with particularity. See Publication Paper, 2005 WL 2175139, at *6 n.7 (acknowledging that whether "plaintiffs' investigation or lack thereof was reasonable is one of fact and not resolvable on a motion to dismiss," but noting that "[t]hat does not, however, excuse plaintiffs from pleading the circumstances surrounding their diligence or lack thereof").

The Court has determined that Named Plaintiffs have failed to plead fraudulent concealment with particularity, and the statute of limitations cannot be tolled. The claims against the remaining Joint Defendants must therefore be dismissed. The CAC will be dismissed as against all Defendants except BoA, Feld Winters, and MGIC, who did not

join in the motion to dismiss.  The Court notes that although Feld Winters did not join in the motion to dismiss, it has already been voluntarily dismissed from the case without prejudice.

D.   REMAINING ARGUMENTS NOT ADDRESSED

Because the Court has determined that Named Plaintiffs' claims should be dismissed as against the Joint Defendants – that is, all Defendants except BoA, Feld Winters, and MGIC – it is not necessary to address Joint Defendants' argument that Named Plaintiffs' claims should be subject to the heightened pleading standard of Rule 9(b).  For the same reason, the Court will not address Joint Defendants' argument that the CAC fails to state a claim with respect to "hedging products," which refers to municipal derivatives pertaining to a municipal bond's underlying interest rate obligations.  Nor will the Court address the argument that the Named Plaintiffs' antitrust claims are preempted by the IRS Code and regulations issued by the Treasury Department.

E.   LEAVE TO REPLEAD

As indicated above, the Court will permit Named Plaintiffs to replead their claims based upon alleged conspiratorial communications by specific individuals employed by the Joint Defendants, as well as claims of fraudulent

concealment.  Named Plaintiffs will have twenty days from the date of this Order to do so.

The Court will also permit Named Plaintiffs to seek leave to replead after there has been at least some discovery regarding the remaining Defendants, in particular, BoA.  BoA and MGIC remain as defendants in this action, and it is not inconceivable that discovery from BoA may reveal more specific details about the identities and activities of BoA's alleged co-conspirators, especially given BoA's participation in the DOJ Antitrust Division's leniency program.

### III. <u>ORDER</u>

For the reasons discussed above, it is hereby

**ORDERED** that the motion (Docket No. 277) of Wachovia Bank N.A. ("Wachovia"); AIG Financial Products Corp. ("AIG"); Bear, Stearns & Co., Inc. ("Bear Stearns"); Financial Security Assurance Holdings, Ltd. ("Financial Security Holdings"); Financial Security Assurance, Inc. ("Financial Security Assurance"); Financial Guaranty Insurance Co. LLC ("Financial Guaranty"); GE Funding Capital Market Services, Inc. ("GE"); Genworth Financial Investment Management, LLC ("Genworth"); Natixis S.A. ("Natixis"); JP Morgan Chase & Co. ("JP Morgan"); Piper Jaffray & Co. ("Piper Jaffray"); Société Générale SA ("Société Générale"); AIG SunAmerica Life Assurance Co. ("AIG SunAmerica"); UBS AG ("UBS"); XL Capital, Ltd. ("XL Capital");

XL Asset Funding Co. I, LLC ("XL Funding"); XL Life Insurance & Annuity Inc. ("XL Life"); Merrill Lynch & Co., Inc. ("Merrill Lynch"); Morgan Stanley; National Westminster Bank PLC ("NatWest"); Natixis Funding Corp ("Natixis Funding"); Investment Management Advisory Group, Inc. ("Investment Management Advisory"); CDR Financial Products ("CDR"); Winters & Co. Advisors, LLC ("Winters & Co."); First Southwest Company ("First Southwest"); George K. Baum & Co. ("Baum"); Kinsell Newcomb & De Dios Inc. ("Kinsell Newcomb"); PackerKiss Securities, Inc. ("PackerKiss"); Shockley Financial Corp. ("Shockley"); Sound Capital Management, Inc. ("Sound Capital"); Cain Brothers & Co., LLC ("Cain Brothers"); Morgan Keegan & Co., Inc. ("Morgan Keegan"); and Trinity Funding Co. LLC ("Trinity Funding") (collectively, "Joint Defendants") to dismiss the consolidated amended class action complaint ("CAC") is GRANTED; and it is further

**ORDERED** that the motion (Docket No. 275) of AIG; AIG SunAmerica; Cain Brothers; Financial Guaranty; First Southwest; GE; Genworth; Kinsell Newcomb; Merrill Lynch; Morgan Keegan; Morgan Stanley; NatWest; Natixis; Shockley; Trinity Funding; XL Funding; XL Capital; and XL Life to dismiss the CAC is GRANTED; and it is further

**ORDERED** that plaintiffs Fairfax County, Virginia, the State of Mississippi, the City of Baltimore, Maryland, the

Central Bucks School District, and the Bucks County Water and Sewer Authority are granted leave to file a second amended complaint repleading claims against the Joint Defendants based upon: (1) allegations that specific individuals employed by Joint Defendants engaged in communications in furtherance of any alleged antitrust violation, and (2) claims of fraudulent concealment, provided that such amended complaint shall be filed within twenty days of this Order. The Court will also consider future requests for leave to replead based upon discovery conducted with defendants not affected by these motions to dismiss.

**SO ORDERED.**

Dated:      New York, New York
            29 April 2009

                                    Victor Marrero
                                       U.S.D.J.

> USDS SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 4-30-09